2025 IL App (1st) 242154-U

FIFTH DIVISION
August 7, 2026

No. 1-24-2154

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE
APPELLATE COURT OF ILLINOIS
FIRST DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County |
| | ) | |
| v. | ) | No. 2022 CR 03102 |
| | ) | |
| RICCO CARRASCO, | ) | The Honorable |
| | ) | Arthur W. Willis, |
| Defendant-Appellant. | ) | Judge Presiding. |

JUSTICE WILSON delivered the judgment of the court.
Presiding Justice Mitchell and Justice Oden Johnson concurred in the judgment.

**ORDER**

¶ 1    *Held*:   The judgment of the circuit court is affirmed where: (1) defendant failed to establish reversible error based on his confrontation clause challenge to DNA testimony; (2) the admission of a jailhouse informant's former testimony did not violate the confrontation clause; (3) the detectives' challenged testimony did not warrant reversal; and (4) the prosecutor's remarks during closing and rebuttal arguments did not deprive defendant of a fair trial.

¶ 2    Following a jury trial, defendant Ricco Carrasco was convicted of offenses arising from a

shooting in which Carrasco fired into a vehicle occupied by three people, striking an eight-year-

old child. The circuit court sentenced Carrasco to concurrent prison terms of 33 years for attempted

first degree murder of the child and 28 years each for attempted first degree murders of the other

two occupants. On appeal, Carrasco contends that (1) the admission of certain DNA testimony violated the confrontation clause; (2) the admission of an unavailable jailhouse informant's prior testimony violated the confrontation clause; (3) certain testimony from the investigating detectives constituted inadmissible hearsay; and (4) the State committed prosecutorial misconduct during closing argument. We affirm.

¶ 3                                    I. BACKGROUND

¶ 4      The underlying shooting occurred on the morning of February 18, 2022, while Manuel Solis was driving his younger brother, U.S., and his sister, O.S., to school on Chicago's south side. According to the State, Carrasco pulled alongside their Honda Civic in a black minivan and fired two shots into the vehicle, one of which struck U.S. The case proceeded to trial. We recount only those facts and proceedings necessary to resolve the issues raised on appeal.

¶ 5      On March 11, 2022, a grand jury returned a true bill of indictment charging Carrasco with eleven felony counts arising from the February 18, 2022, shooting. The indictment charged Carrasco with three counts of attempt first degree murder of U.S., an eight-year-old child (720 ILCS 5/8-4(a), 9-1(a)(1) (West 2022)); two counts of attempt first degree murder of Manuel (*id.* §§ 8-4(a), 9-1(a)(1)); two counts of attempt first degree murder of O.S. (*id.* §§ 8-4(a), 9-1(a)(1)); one count of aggravated battery of a child under 13 with a firearm as to U.S. (*id.* § 12-3.05(e)(1)); and three counts of aggravated discharge of a firearm, one each as to U.S., Manuel, and O.S. (*id.* § 24-1.2(a)(2)).

¶ 6                            A. Pretrial Proceedings

¶ 7      On July 20, 2023, before trial, the State disclosed Webster Fisher as an informant under section 115-21 of the Code of Criminal Procedure of 1963 (Code) (725 ILCS 5/115-21 (West 2022)) and requested a hearing to determine whether his proposed testimony was reliable. The

reliability hearing commenced on November 9, 2023, where Fisher testified that he had thirteen prior criminal convictions and four pending cases, including two felony burglary cases. Fisher identified Carrasco in court and testified that they had shared a two-person cell at Stateville Correctional Center from April 13 to May 1, 2022. According to Fisher, they spoke "day and night," and Carrasco initiated many of their conversations.

¶ 8 Fisher testified that Carrasco gave him "the whole rundown" of the shooting. According to Fisher, Carrasco said that he had been arguing with his girlfriend while she was taking their children to school; Carrasco was driving a van, his girlfriend was driving a car, and Carrasco had been "bumping into her car from behind with his kids in it." Fisher further testified that Carrasco said that, while "going down the street to go back to wherever he was going," he encountered a vehicle occupied by three "opposition" gang members and fired into it with a gun that had been "in his lap while he was driving." Fisher also testified that he proofread "a few" letters Carrasco had written, advised Carrasco that he "might not want to say" certain incriminating things, and overheard him discuss the case during telephone calls. No letters, recordings, or other physical evidence corroborating those communications were introduced at the hearing.

¶ 9 Fisher did not report Carrasco's statements while the two were housed together at Stateville. After Fisher was transferred to the Danville Correctional Center, however, he reported the information to prison intelligence personnel and participated in a recorded interview. Fisher acknowledged that he contacted his attorney in the hope of "catch[ing] a deal" or having time removed from his sentence. His attorney contacted the Cook County State's Attorney's Office, but Fisher received no reduction in his sentence and testified that no promises were made to him.

¶ 10 After his release from prison on January 26, 2023, Fisher "did some looking up" and located a news report stating that Carrasco had been charged with shooting an eight-year-old child,

3

rather than three rival gang members. Fisher contacted his attorney again because he "still want[ed] to do something" and was now "doing it for free." On February 23, 2023, Fisher participated in a recorded interview with Chicago police detectives at the Pontiac Police Department.

¶ 11    On cross-examination, defense counsel questioned Fisher concerning his criminal history, pending cases, initial desire to obtain a benefit, delay in reporting Carrasco's alleged statements, internet research, former gang affiliation, the absence of any witness to the alleged conversations, and his failure to retain Carrasco's letters. Counsel also questioned Fisher about the circumstances surrounding the alleged telephone calls and conversations. When counsel suggested that Fisher's "main thing" in reporting Carrasco had been to "catch a deal," Fisher responded that, as he grew older, it had become "a matter of right and wrong" and of "balancing the scales." Fisher added: "I'm sick. I'm dying actually. I have had two heart attacks. I currently have cancer, stage IV COPD." He later characterized his decision to testify as "a matter of morals," explaining, "I lost a child seven-and-a-half years ago. So it gives you a new perspective on things."

¶ 12    On redirect examination, Fisher testified that he had no pending cases when he reported Carrasco's alleged statements to prison intelligence personnel or spoke with the Chicago police detectives and that he had received no promises concerning his later-filed cases. On recross-examination, Fisher stated that he was "doing this on [his] own free will." The circuit court also confirmed that Fisher had no pending charges when he met with the detectives on February 23, 2023. The court then granted the State's motion, concluding: "There is reliability. His testimony is reliable and should be admitted at trial pursuant to statute."

¶ 13    Fisher died by suicide on January 4, 2024, before trial. On January 10, 2024, the State moved to admit the transcript of his reliability-hearing testimony as the former testimony of an unavailable declarant under Illinois Rule of Evidence 804(b)(1) (eff. Jan. 1, 2011) and,

alternatively, under section 115-10.4 of the Code (725 ILCS 5/115-10.4 (West 2022)). Defense counsel objected, arguing, *inter alia*, that his prior cross-examination was limited to the statutory reliability inquiry and that reading the transcript would prevent the jury from observing Fisher's demeanor.

¶ 14 The circuit court granted the motion, finding that Fisher's sworn testimony concerned "a material fact," had been subject to cross-examination while Carrasco was represented by counsel, was "more probative than anything else the State can do in this matter," and was "essential to [the State's] case." The parties later stipulated that the testimony would be read to the jury in question-and-answer form, with the parties' arguments omitted.

¶ 15 In a separate motion *in limine* hearing, held December 14, 2023, the State sought to introduce course-of-investigation testimony explaining how detectives identified Carrasco as a suspect. The State represented that detectives traced the black minivan's license plate to its female registered owner, later identified as Yesenia Conde, and searched her name in a police database. That search produced a domestic-battery report and a traffic-crash report that "both list[ed] the defendant as being involved." Detectives then reviewed information, obtained Carrasco's photograph, and included it in a photo array shown to O.S. The State represented that it would not mention the domestic-battery report and proposed to elicit only that detectives located a traffic-crash report "that listed the defendant as a passenger in a vehicle during that crash" and then retrieved his photograph.

¶ 16 Defense counsel objected but stated that his "only concern" involved the domestic-battery report. After the court established what the scope of the proposed testimony was, counsel made "a standing objection to it again." The State agreed that the detective would "not bring up the domestic reports in any way" and would limit his testimony to locating the crash report, seeing

that Carrasco was listed as a passenger, and retrieving Carrasco's photograph. The court granted that portion of the State's motion "over Defense's objection" but prohibited any reference to a criminal act or a "criminal database."

¶ 17                                    B. Trial

¶ 18    Jury selection began on January 16, 2024, and the presentation of evidence commenced the following day. The evidence established that, on the morning of February 18, 2022, 19-year-old Manuel Solis was driving his younger siblings to school in his blue-gray, four-door Honda Civic, which had tinted windows. Seventeen-year-old O.S. was seated in the front passenger seat, and eight-year-old U.S. was seated in the middle of the rear seat. It had snowed the previous night, and Manuel was traveling on side streets when they reached the 4000 block of South Brighton Place in Chicago, Illinois. A black minivan, later identified as a 2009 Chrysler Town & Country, approached from the opposite direction. As the vehicles passed, they came "very close" to one another.

¶ 19    Manuel testified that, as the vehicles came alongside one another, the minivan's driver "pointed the gun at the glass" and "[t]apped it on the glass," prompting Manuel to "just dr[ive] off." After accelerating, Manuel heard two gunshots and "cackling like something got hit in the car," although he did not see the driver fire the weapon. Manuel described the driver as a Hispanic man with "heavy tattoos" on his face, neck, and hand. Two days later, Manuel viewed a photographic array but did not identify Carrasco; instead, he selected another Hispanic man with a facial tattoo.

¶ 20    O.S. testified that, from the Civic's front passenger seat, she observed the minivan as the vehicles passed within "[l]ess than five feet" of one another. Because the minivan's windshield was not tinted and its driver-side window was open, she could see the driver's face. She saw the

driver holding a firearm and tapping it against the Civic's driver-side window. O.S. told Manuel to speed up and instructed U.S. to "duck down," after which she "started hearing [gun]shots" that "were coming through the car." The following day, O.S. selected Carrasco's photograph from an array administered by Detective Daniel Burns, and she identified Carrasco at trial as the minivan's driver. She also testified that the driver had a tattoo "like a Christian cross," approximately one inch long, on the left side of his face and the letter "A" tattooed on his neck. O.S. acknowledged that the minivan sat higher than the Civic, that the encounter "happened very quickly," and that she could not recall which hand held the firearm or whether she had previously reported the "A" tattoo.

¶ 21    U.S. testified that, from the middle of the Civic's rear seat, he saw a person seated in the minivan's driver's seat with "some tattoos" on his face and a dark-colored gun. He then heard "more than one" gunshot, although he did not see the driver fire the weapon. U.S. described one of the driver's facial tattoos as resembling a "five-point star" on his cheek. He acknowledged that the minivan's side windows were tinted and that he could not see the driver's hands, clothing, or hair. U.S. further testified that he had never seen the driver before and could not recognize him.

¶ 22    The State also played a recording of U.S.'s February 23, 2022, forensic interview at the Chicago Children's Advocacy Center, which the court had admitted under section 115-10 of the Code (725 ILCS 5/115-10 (West 2022)). Veronica Pierce, the forensic interviewer, testified concerning that interview. Unlike his trial testimony describing a star on the driver's cheek, U.S. told Pierce that the driver had a star tattoo on his forehead, curly black hair, and brown skin. U.S. stated that he could not discern additional details "because he *** could not see," and he acknowledged that some of the information he provided had come from his brother.

¶ 23    After the shooting, Manuel drove to O.S.'s school, where he and O.S. observed two apparent bullet holes in or near the Civic's trunk. Manuel then drove U.S. home. U.S. told Manuel that "he felt wet by his butt area," and Manuel discovered "blood on his butt" and what appeared to be bullet wounds. The parties stipulated that a physician examined U.S. at Stroger Hospital and observed "a one centimeter gunshot wound to the right buttock at the midline and a one centimeter gunshot wound to the right buttock at the gluteal cleft," which were designated the entry and exit wounds from a single gunshot. O.S. later photographed the resulting markings and testified that they remained visible during the month of trial.

¶ 24    Detective William Johnson testified that he recovered surveillance recordings from 4010 South Brighton Place and other nearby locations. One recording depicted the Civic and the black minivan traveling in opposite directions, the minivan's driver-side window lowering, and the sound of gunfire. Using additional recordings and license-plate information, Johnson identified the vehicle as a black 2009 Chrysler Town & Country bearing Illinois license plate CY31265 and registered to Yesenia Conde. Johnson narrated other recordings depicting the minivan's movements before and after the shooting, including footage of a person wearing dark clothing leaving the minivan and entering a residence on South Fairfield Avenue. On cross-examination, Johnson acknowledged that none of the recordings permitted him to identify Carrasco as the minivan's driver or occupant and that the minivan's side windows were tinted.

¶ 25    Consistent with the court's ruling on the State's motion *in limine*, Detective Johnson testified that a traffic-crash report from the day before the shooting identified Carrasco as a passenger in a rental Ford EcoSport driven by Conde. Johnson testified that he then "looked up [Carrasco's] picture in our database," concluded that Carrasco matched the descriptions supplied

by the Civic's occupants, and began investigating him as a suspect. After O.S. selected Carrasco's photograph from an array, Johnson directed other officers to locate and arrest him.

¶ 26 Detective Nicholas Mukite testified that, on February 22, 2022, he observed Carrasco leave a residence at 2729 West 45th Street and enter the driver's seat of "a black van," where officers arrested him. On cross-examination, Mukite acknowledged that Carrasco was not the vehicle's registered owner but stated that he believed the owner was Carrasco's "girlfriend or wife." Defense counsel did not object or move to strike the testimony. On redirect examination, Mukite identified the registered owner as Yesenia Conde and described her as Carrasco's "fiancee or wife." The parties separately stipulated that Conde owned the minivan.

¶ 27 On February 23, 2022, evidence technician Angel Cahue processed the minivan, collecting swabs from the driver-side interior for DNA and gunshot-residue testing and a latent fingerprint from the rearview mirror. Illinois State Police (ISP) forensic scientist Julie Wessel testified that the fingerprint did not match Carrasco's. On September 8, 2022, investigator Sabrina Harris collected a buccal swab from Carrasco for DNA comparison with the DNA recovered from the minivan.

¶ 28 The day before the State presented its DNA evidence, the prosecutor informed the court outside the jury's presence that the analyst originally expected to testify was unavailable because of illness:

> "[T]he DNA analyst is sick with a fever of over a hundred, but there will be a – – I believe it's called a technical chain or technical review person, that peer analyst, who comes to their own finding and conclusion based on the work done at the Illinois State Police. She'll be available tomorrow."

¶ 29    The court asked defense counsel whether he concurred, and counsel responded, "I do, Your Honor.

¶ 30    Later that day, the prosecutor identified the substitute witness as Andrea Paulsen and stated that Paulsen's current curriculum vitae (CV) had been tendered to defense counsel. Counsel responded, "I acknowledge receipt, your Honor." When the court asked whether Paulsen had previously been disclosed, the prosecutor stated, "She's the peer reviewer, so she's listed in the [Rule] 417 materials." Defense counsel then stated, "We have no objection, Your Honor." The following day, when the State tendered Paulsen as an expert in forensic DNA analysis, defense counsel again stated, "No objection." The court qualified Paulsen as an expert without objection.

¶ 31    On the last day of trial, Paulsen testified that she was an ISP forensic scientist and that she had been asked to "review DNA data" in this case. She further testified that the laboratory compared Carrasco's buccal-swab standard with two swabs collected from the minivan's "interior front driver's side compartment." And that the DNA testing revealed a three-person mixture, which the laboratory interpreted using STRmix probabilistic-genotyping software.

¶ 32    She testified that STRmix evaluated two propositions: first, that the DNA profile originated from Carrasco and two unknown, unrelated individuals; and second, that it originated from three unknown, unrelated individuals. According to Paulsen, "[t]he DNA profile is approximately 320 trillion times more likely if it originated from Ricco Carrasco and two unknown unrelated individuals than if it originated from three unknown unrelated individuals." She opined that the result provided "very strong support for the proposition that Ricco Carrasco is a contributor to the DNA profile."

¶ 33    Paulsen also testified that the proper controls had been run and that the laboratory maintained the chain of custody. When asked whether she had used the DNA data to form her own

conclusions and opinions, Paulsen answered, "Yes. When I technical review a case file I am looking to ensure technical accuracy as well as compliance with all of our policies and procedures, and that would include all of the controls being run correctly."

¶ 34    Paulsen did not identify the analyst who performed the extraction, quantitation, amplification, instrument testing, or initial STRmix analysis, nor did she testify that she personally performed those procedures.

¶ 35    The State also presented Fisher's prior testimony—pursuant to prior stipulation—by reading to the jury, in question-and-answer format, the transcript of the November 9, 2023, reliability hearing. The reading included the parties' examinations of Fisher and the court's questions but omitted the parties' arguments.

¶ 36    After the State rested, the circuit court denied Carrasco's motion for a directed verdict.

¶ 37    In closing argument, the State asserted that Carrasco fired two bullets into the Civic and struck U.S. It described the bullet as "tear[ing] through this boy" and referred to the resulting scars as "permanent disfigurement." The State argued that Carrasco "put himself there when his DNA was recovered from the driver's cabin" of the minivan and that O.S.'s identification had "science supporting *** and corroborating it."

¶ 38    The State argued that the shooting "demand[ed] accountability" and that holding Carrasco accountable required "everyone doing their part." In that regard, the prosecutor praised O.S. for having "courageously" testified, stated that U.S. had shown "a tremendous amount of courage" by doing the same, and asserted that law enforcement had done its part by locating the minivan and arresting Carrasco. The prosecutor then told the jurors, "I can only hope *** that we've shown you this evidence and presented it to you in such a way that you've come to know what we know, and

11

that's that this defendant is guilty." The prosecutor concluded, "[I]f we've done our part I then ask you to do yours. Find him guilty."

¶ 39    In rebuttal, the State argued that the DNA analysis provided "very strong support for the fact that this defendant's DNA was in those swabs. The prosecutor also contrasted Fisher with a hypothetical informant who received a benefit for cooperating, describing Fisher as "[t]he guy who was *** putting himself at risk making himself a witness to a case in exchange for nothing[.]" The prosecutor then reminded the jurors that, when they were sworn, they had "agreed at that point to speak with one voice." The State urged the jurors to "speak as one and send one message to this defendant that the rampant gun violence that he inflicted on the City of Chicago on the 4000 block of South Brighton and upon the Solis family" was "not okay," and to find him guilty of every count.

¶ 40    Carrasco did not object during the State's closing or rebuttal argument.

¶ 41    Following closing arguments, the jury returned guilty verdicts on all counts. The court denied Carrasco's motion for a new trial, which did not raise the confrontation-clause, hearsay, or closing-argument claims presented in this appeal. On October 16, 2024, the court sentenced Carrasco, merging the aggravated battery and aggravated discharge of a firearm convictions into the three attempted first degree murder convictions and imposing concurrent prison terms of 33 years for the attempted first degree murder of U.S. and 28 years each for the attempted first degree murders of Manuel and O.S. The court denied Carrasco's motion to reconsider sentence. Carrasco filed a timely notice of appeal on October 18, 2024. Accordingly, this court has jurisdiction pursuant Illinois Supreme Court Rule 603 (eff. Feb. 6, 2023) and 606 (eff. Jan. 1, 2026).

¶ 42                                     II. ANALYSIS

¶ 43                        A. Admission of Andrea Paulsen's DNA Testimony

¶ 44    Carrasco first contends that his confrontation rights were violated when Paulsen, an ISP forensic scientist, testified concerning DNA testing performed by another analyst. The State responds that Carrasco invited any error by expressly agreeing to Paulsen's substitution and that, in any event, her testimony did not convey testimonial hearsay and any error was harmless.

¶ 45    Carrasco concedes he neither objected at trial nor raised the issue in his post-trial motion; it is therefore forfeited. See *People v. Sebby*, 2017 IL 119445, ¶ 48 ("To preserve a purported error for consideration by a reviewing court, a defendant must object to the error at trial and raise the error in a posttrial motion."). Carrasco nevertheless asks us to review the claim under both prongs of the plain-error doctrine or, alternatively, as a matter of ineffective assistance of counsel.

¶ 46    The plain error doctrine is an exception to the general forfeiture rules that allows a reviewing court to address an unpreserved claim of error where a clear or obvious error occurred. *People v. Hartfield*, 2022 IL 126729, ¶ 50. The defendant must show either (1) "a clear or obvious error occurred and the evidence is so closely balanced that the error alone threatened to tip the scales of justice against the defendant, regardless of the seriousness of the error," or (2) when "a clear or obvious error occurred and that error is so serious that it affected the fairness of the defendant's trial and challenged the integrity of the judicial process, regardless of the closeness of the evidence." *Sebby*, 2017 IL 119445, ¶ 48. The burden of persuasion lies with the defendant. *People v. Herron*, 215 Ill. 2d 167, 186 (2005).

¶ 47    Foremost, we agree with the State that any confrontation error was invited. "Under the doctrine of invited error, 'a party cannot complain of error which that party induced the court to make or to which that party consented. The rationale behind this well-established rule is that it would be manifestly unfair to allow a party a second trial upon the basis of error which that party injected into the proceedings.' " *People v. Holman*, 2025 IL App (2d) 240513, ¶ 40. Moreover,

invited error " ' does not raise a mere forfeiture to which the plain-error exception might apply; it creates an estoppel that precludes plain-error analysis.' " *People v. Quezada*, 2024 IL 128805, ¶ 59 (quoting *People v. Holloway*, 2019 IL App (2d) 170551, ¶ 44).

¶ 48    The record here reflects successive, affirmative acquiescences by defense counsel to the State's use of Paulsen as the substitute DNA analyst and the admission of her testimony. Before trial, the State informed the court and counsel that the original DNA analyst was ill and that a "technical review person" or "peer analyst" would testify and "come[] to their own finding[s] and conclusion[s] based on the work done at the ISP." When the court asked defense counsel whether he concurred, counsel responded, "I do, Your Honor." The next day, the State identified Paulsen as the replacement analyst, tendered her current CV to defense counsel, and represented that she was "the peer reviewer" listed in the Illinois Supreme Court Rule 417 (eff. March 1, 2001) materials. Defense counsel acknowledged receipt of the CV and, when asked by the court for his position, stated, "We have no objection, Your Honor." When the State moved the court to qualify Paulsen as an expert "in the field of DNA analysis," defense counsel again stated, "No objection." Counsel likewise did not object to Paulsen's use of her report and notes during her testimony. Paulsen then testified without objection on direct examination, and defense counsel cross-examined her. After Paulsen was excused, the State moved to admit its exhibits, and defense counsel again stated, "No objection."

¶ 49    This is not a case of an isolated instance of silence or failure to object. Counsel repeatedly and expressly consented after being advised that the State intended to present its DNA evidence through a substitute analyst and after receiving Paulsen's qualifications. Such affirmative acquiescence invites any resulting confrontation error. See, *e.g.*, *Cox*, 2017 IL App (1st) 151536, ¶¶ 74-76 (holding that counsel's repeated "no objection" responses to admission of a certification

that ISP records showed the defendant lacked a FOID card invited any confrontation error and noting that, had counsel objected, the State could have remedied the problem by calling the certifying witness); *Quezada*, 2024 IL 128805, ¶ 59 (defense counsel's express statement that he had "no objection" to the challenged evidence constituted affirmative acquiescence that precluded plain-error review); *People v. Parker*, 223 Ill. 2d 494, 507-08 (2006) (noting that "the record indicates defendant waived any jury instruction issues by affirmatively agreeing to all instructions as submitted to the jury").

¶ 50    Carrasco argues that stating "no objection" is not the same as affirmatively offering or requesting improper evidence, and that counsel did not suggest using Paulsen instead of the original DNA analyst. We disagree. Consistent with the aforementioned cases, invited error does not require counsel to originate the challenged procedure; affirmative acquiescence is sufficient. On this record, there is no doubt that counsel affirmatively acquiesced in the State's proposed use of Paulsen.

¶ 51    The rationale underlying the doctrine also supports our conclusion. By consenting rather than objecting, a defendant deprives the State and the circuit court of an opportunity to address the alleged defect. *Holman*, 2025 IL App (2d) 240513, ¶ 40; *Cox*, 2017 IL App (1st) 151536, ¶¶ 74-76. Had counsel raised a confrontation objection when the State disclosed that Paulsen would testify in the original analyst's place, the State could have sought a continuance, attempted to secure the original analyst's testimony, or otherwise modified its presentation of the DNA evidence. Carrasco therefore may not obtain plain-error review of the same course of proceedings to which counsel agreed in the circuit court. *Quezada*, 2024 IL 128805, ¶ 59. Accordingly, his plain-error claim is barred.

¶ 52    That conclusion, however, does not automatically dispose of Carrasco's alternative claim that counsel was ineffective for acquiescing to Paulsen's testimony or failing to object when she testified. Ineffective assistance of counsel is also an exception to the general forfeiture rules; in order to prevail, a defendant must establish both that (1) his attorney's representation fell below an objective standard of reasonableness and (2) that, but for counsel's deficient performance, the result of the proceeding would have been different. *People v. Patterson*, 192 Ill. 2d 93, 107 (2000) (citing *Strickland v. Washington*, 466 U.S. 668, 687, 695 (1984)). The failure to satisfy either prong precludes a finding of ineffective assistance of counsel; thus, we may resolve Carrasco's claim on prejudice alone. *Id*.

¶ 53    To establish prejudice, defendant must show "that counsel's performance was objectively unreasonable under prevailing professional norms and that there is a 'reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.' " (Internal quotation marks omitted.) *Carroll*, 2026 IL 131360, ¶ 67 (quoting *Strickland*, 466 U.S. at 694, 104 S.Ct. 2052). "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694. The question is not whether the challenged evidence was useful to the State, but whether, considering the totality of the evidence before the jury, there is a reasonable probability that the absence of that evidence would have changed the result. See *People v. Donegan*, 2012 IL App (1st) 102325, ¶¶ 47-48 (citing *Strickland*, 466 U.S. at 694–96).

¶ 54    Even assuming, without deciding, that counsel performed deficiently and that a confrontation objection would have resulted in exclusion of Paulsen's testimony, Carrasco has not demonstrated prejudice. As explained below, the limited proposition established by the DNA

evidence, considered against the strength of the remaining evidence, does not undermine confidence in the verdict.

¶ 55 Carrasco characterizes the DNA evidence as the "lynchpin" of the State's case and contends that its exclusion creates a reasonable probability of a different result because the remaining identification evidence was conflicting. We disagree. The State's case did not turn on the DNA evidence. Paulsen's testimony did not identify Carrasco as the shooter nor established that he occupied the minivan when the offenses occurred. Paulsen's testimony even acknowledged that the analysis could not determine "when that DNA was deposited inside the interior of that vehicle." At most, the DNA evidence showed that Carrasco came in contact with the driver's area at some point before the samples were collected. That inference merely corroborated other evidence connecting Carrasco to the minivan, but it did not independently establish his participation in the shooting.

¶ 56 The State presented identification evidence independent of Paulsen's testimony. O.S., who was seated in the Civic's front passenger seat, testified that the vehicles passed within "[l]ess than five feet" of each other and that she saw the minivan's driver holding a firearm. The following day, she selected Carrasco's photograph from an array. At trial, she again identified him as the driver and shooter and correctly testified that the driver had a "Christian cross" on the left side of his face and the letter "A" tattooed on his neck.

¶ 57 Carrasco contends that Manuel's selection of a different person from a separate array, and U.S.'s failure to identify anyone, undermine O.S.'s identification. Then at oral argument, he elaborated on that position, stating that because Manuel had the closest physical proximity to the shooter, his identification—or non-identification—should carry the most weight of the three occupants. Again, we disagree. Each occupant viewed the driver from a different vantage point

17

and under different conditions. Manuel was operating the Civic during the encounter, whereas O.S. was seated in the front passenger seat. Proximity to the shooter does not translate into a superior opportunity to observe him. See *People v. Johnson*, 2026 IL 131337, ¶ 83 (rejecting reliance on one witness's inability to identify the defendant where that witness focused on protecting the vehicle's occupants, while the identifying witnesses were closer to the shooter or maintained an unobstructed view).

¶ 58    U.S.'s nonidentification fares no better. He did not identify another person; he declined to participate in an identification procedure, and his silence therefore does not contradict O.S.'s testimony. See *People v. Gavin*, 2021 IL App (1st) 182085, ¶¶ 21, 40 (distinguishing a "negative identification," in which a witness identifies someone else, from a "non-identification," in which the witness identifies no one).

¶ 59    Nor does Carrasco meaningfully challenge the reliability of O.S.'s identification itself. This is significant because "[a] single witness' identification of the accused is sufficient to sustain a conviction if the witness viewed the accused under circumstances permitting a positive identification." See *People v. Slim*, 127 Ill. 2d 302, 307-08 (1989). O.S. observed the driver at close range, selected Carrasco's photograph the following day, and repeated that identification at trial. That identification was wholly independent of Paulsen's testimony and, standing alone, was sufficient to sustain the convictions as a matter of law. Although the legal sufficiency of O.S.'s testimony does not automatically foreclose *Strickland* prejudice, the strength and independence of her identification weigh decisively against a reasonable probability of a different result.

¶ 60    The remaining evidence furthers our conclusion by connecting Carrasco to the offense. Detective Johnson testified that surveillance footage depicted the Civic and the black minivan passing in opposite directions, the minivan's driver-side window lowering, and the sound of

gunfire. Using additional footage, Johson traced the minivan's movements and identified its license plate. With that information, he was able to identify the owner of the minivan as Yesenia Conde, a fact to which the parties also stipulated. Johnson further testified that a search of records associated with Conde produced a prior traffic-crash report in which Conde was identified as the driver of a different vehicle—a Ford EcoSport—and Carrasco was listed as a passenger. After concluding that Carrasco matched the description provided by the Civic's occupants, Johnson obtained Carrasco's photograph and included it in the photographic array from which O.S. identified him. Detective Mukite testified that, four days after the shooting, he observed Carrasco enter the driver's seat of the same minivan identified through the surveillance video and arrested him. Finally, Fisher's prior testimony at the section 115-21 reliability hearing, which was admitted into evidence after his death, was read to the jury and recounted Carrasco's admission that he shot at the victims' vehicle.

¶ 61      As discussed more fully below, Carrasco separately challenges Fisher's prior testimony and portions of the detectives' testimony connecting him to the offense. He further argues that the cumulative exclusion of that evidence and Paulsen's testimony creates a reasonable probability of a different result. Even accepting that premise, he cannot establish *Strickland* prejudice. The jury still heard O.S.'s independent, close-range identification of Carrasco, surveillance footage documenting the shooting from the identified minivan, and evidence placing Carrasco in the driver's seat of that minivan four days later. Thus, even accepting Carrasco's cumulative-prejudice theory, there is no reasonable probability of a different result.

¶ 62      We do not minimize the persuasive force of DNA evidence. See *People v. Pike*, 2016 IL App (1st) 122626, ¶¶ 96-97 (recognizing that statistical-probability DNA evidence may be "overwhelming" and "extremely persuasive to a jury" where the likelihood of a random match is

extremely small). However, its significance in a particular case depends on the proposition it establishes in light of the other evidence as a whole. See *People v. Stoecker*, 2014 IL 115756, ¶ 33 (explaining that the significance of forensic evidence requires consideration of both the trial evidence and the evidence at issue); *People v. Leverson*, 2024 IL App (1st) 211083, ¶¶ 139-41 (concluding that DNA on a firearm indicated only that the defendant may have handled it at some point where the expert could not determine when the DNA was deposited); *People v. Escort*, 2017 IL App (1st) 151247, ¶ 21 (concluding that DNA established an encounter within a 72-hour period but did not establish when within that period the encounter occurred or connect it temporally to the victim's death). As discussed, Paulsen's testimony established only a limited, undated connection between Carrasco and the minivan. Considered in that proper context and against the evidence as a whole, its exclusion does not create a reasonable probability of a different result.

¶ 63                    B. Admission of Webster Fisher's Testimony

¶ 64    Carrasco next contends that the trial court violated his sixth amendment right to confront the witnesses against him by admitting Fisher's testimony from a pretrial informant-reliability hearing because his prior opportunity to cross-examine Fisher was constitutionally inadequate. The State responds that Carrasco forfeited the claim by omitting it from his posttrial motion and that, in any event, no confrontation violation occurred because defense counsel had an adequate opportunity to cross-examine Fisher at the reliability hearing and that any error was harmless.

¶ 65    Although defense counsel objected before trial to the admission of Fisher's reliability-hearing testimony, Carrasco concedes that counsel did not include the confrontation-clause claim in his posttrial motion. The claim is therefore forfeited. *People v. Enoch*, 122 Ill. 2d 176, 186 (1988); *Sebby*, 2017 IL 119445, ¶ 48. Carrasco nevertheless seeks review under the plain-error doctrine or, alternatively, as a claim of ineffective assistance of counsel. To obtain relief under

either theory, Carrasco must first establish that an error occurred. *People v. Cox*, 2017 IL App (1st) 151536, ¶ 52. We therefore consider the merits of Carrasco's confrontation claim.

¶ 66    The parties dispute the applicable standard of review. The State contends that a trial court's ruling on the admission of former testimony is reviewed for abuse of discretion. See *People v. Sutherland*, 223 Ill. 2d 187, 272-73 (2006). Carrasco responds that, because his challenge sounds in the confrontation clause, review is *de novo*. See *People v. Barner*, 2015 IL 116949, ¶ 39. Carrasco does not challenge the trial court's determination that Fisher's testimony satisfied Illinois Rule of Evidence 804(b)(1) (eff. Jan. 1, 2011). Rather, he separately contends that its admission violated his confrontation rights. We therefore review that constitutional question *de novo*. *Id.*; see *People v. Torres*, 2012 IL 111302, ¶ 52 (the requirement of a prior, adequate opportunity to cross-examine is "both an evidentiary and constitutional requisite for admission of former testimony.").

¶ 67    The sixth amendment guarantees an accused the right "to be confronted with the witnesses against him." U.S. Const., amend. VI. The confrontation clause "provides two types of protections for a criminal defendant: the right physically to face those who testify against him, and the right to conduct cross-examination." *People v. Hood*, 2016 IL 118581, ¶ 19 (quoting *Pennsylvania v. Ritchie*, 480 U.S. 39, 51, (1987)). The constitutionality of admitting an out-of-court statement at trial is governed by *Crawford v. Washington*, 541 U.S. 36 (2004), which found that the confrontation clause prohibits the "admission of testimonial statements of a witness who did not appear at trial unless [the witness] was unavailable to testify, and the defendant had had a prior opportunity for cross-examination." *Id.* at ¶ 20 (quoting *Washington*, 541 U.S. at 53-54).

¶ 68    Under *Crawford*, the threshold question is whether Fisher's testimony at the section 115-21 reliability hearing was testimonial. There is no dispute that it was. Testimony given under oath

at a judicial hearing falls within the core class of testimonial statements contemplated by *Crawford*. *Crawford*, 541 U.S. at 51-52, 68.

¶ 69　Because Fisher's reliability-hearing testimony was testimonial, the State was required to establish that he was unavailable to testify at trial. *Id*. at 53-54. That requirement is undisputed here. Fisher died before trial, and Carrasco does not contest his unavailability. The remaining question is therefore whether Carrasco had a prior " 'adequate opportunity to cross-examine' " Fisher. *Id*. at 57. Whether that opportunity was adequate must be decided case by case. *Sutherland*, 223 Ill. 2d at 273.

¶ 70　There are four main considerations that bear on the adequacy of the prior opportunity: "(1) whether the prior cross-examination had the same or similar motivation as a subsequent examination, (2) whether defense counsel had an unlimited opportunity to cross-examine, (3) whether defense counsel knew all relevant information to conduct an effective cross-examination, and (4) whether there were any restrictions, overt or covert, on the examination." *People v. Diggs*, 2023 IL App (1st) 220955, ¶ 125 (citing *Torres*, 2012 IL 111302, ¶¶ 58-64).

¶ 71　Fisher's testimony was given at a pretrial reliability hearing conducted under section 115-21 of the Code. Section 115-21 of the Code governs the admissibility of testimony from an informant, "someone who is purporting to testify about admissions made to him or her by the accused while detained or incarcerated in a penal institution contemporaneously." 725 ILCS 5/115-21(a) (West 2022). Where the statute applies, the trial court must hold a pretrial evidentiary hearing at which the State bears the burden to show by a preponderance of the evidence that the informant's testimony is reliable. *Id*. § (c), (d). At that hearing the court considers, among other matters, any benefit the informant has received or expects to receive, the informant's criminal history, whether the informant has recanted, whether the informant has previously provided reliable information,

22

and any other factor bearing on reliability. *Id.* The parties agree that Fisher qualified as an informant under section 115-21(a) of the Code and that a reliability hearing was required.

¶ 72    Although section 115-21 of the Code defines the purpose of the earlier reliability proceeding, that purpose informs, but does not control, whether Carrasco's prior opportunity for cross-examination was constitutionally adequate. That determination turns on the considerations that bear on the adequacy of the prior opportunity identified in *Torres*. *Torres*, 2012 IL 111302, ¶¶ 58-64.

¶ 73    Carrasco's challenge rests on two contentions. First, he maintains that counsel's motive and focus at the section 115-21 hearing differed materially from the motive and focus counsel would have had at trial. Second, he contends that counsel lacked material impeachment information concerning Fisher's mental state because Fisher died by suicide after the hearing but before trial. We address those contentions in turn.

¶ 74    As to the first contention, Carrasco emphasizes that the reliability hearing was a threshold proceeding before a judge and did not determine his guilt. He argues that counsel therefore had reason to ask broad questions bearing on Fisher's reliability, even at the risk of eliciting damaging testimony that counsel might have avoided before a jury. Carrasco points, *inter alia*, to counsel's questions that elicited Fisher's testimony that Carrasco was an "Ambrose" gang member, that the two had been confined together at Stateville for "17 days", and that Fisher had seen Carrasco use another person's telephone PIN "more than a handful" of times. According to Carrasco, counsel would have tailored the examination before a jury to avoid eliciting those details.

¶ 75    We are not persuaded that this distinction establishes clear or obvious error. Under *Torres*, ' "the motive and focus of the cross-examination at the time of the initial proceeding must be the *same or similar to* that which guides the cross-examination during the subsequent proceeding."

23

(Emphasis added.) *Torres*, 2012 IL 111302, ¶ 58 (quoting *Sutherland*, 223 Ill.2d at 273). There, the court found a similar motive and focus where the witness's prior testimony implicated the defendant, giving defense counsel reason to test the witness's credibility, powers of observation, and recall and, if possible, undermine the testimony before the factfinder. *Id*. ¶ 59. The same was true here. Fisher's testimony implicated Carrasco, and the section 115-21 hearing required the court to determine whether that testimony was sufficiently reliable to be admitted at trial. 725 ILCS 5/115-21(c), (d) (West 2022). Counsel therefore had reason to examine the same matters that would bear on Fisher's credibility before a jury, including Fisher's criminal history, any benefits received or expected, the circumstances and timing of his disclosure, any recantation, his prior reliability, and other factors bearing on credibility. *Id.*

¶ 76 The record confirms that counsel in fact pursued those subjects. Fisher acknowledged his "lengthy criminal record," four pending cases, including two felonies carrying possible sentences of "[t]hree to seven years," and that his "main objective initially was to reach a deal through the assistance of [his] attorney to lessen any possible sentence" by "[m]onths or weeks." Counsel also examined the circumstances of the alleged conversations, establishing that Fisher and Carrasco were alone in a "two-man cell" for "17 days" and that Fisher did not report the conversations until after his transfer from Stateville to Danville.

¶ 77 Counsel further tested the basis and accuracy of Fisher's account. Fisher admitted that he "never took any notes," possessed no letters from Carrasco, and could not recall Carrasco's girlfriend's name, despite claiming that he had observed Carrasco use another person's telephone PIN "more than a handful" of times in order to contact her. Counsel also contrasted Fisher's stated moral reason for coming forward with his "four cases pending," to which Fisher responded,

"[t]hings happen." The examination thus addressed the principal matters bearing on Fisher's credibility and the reliability of his account. *Torres*, 2012 IL 111302, ¶¶ 58-61.

¶ 78    We acknowledge that counsel might have framed some questions differently before a jury. But the confrontation clause requires a similar motive and focus, not identical proceedings or trial strategies. *Id*. ¶ 58. The possibility that counsel would have altered the phrasing of particular questions at trial does not establish a materially different motive where, in both proceedings, the object of cross-examination was to expose weaknesses in Fisher's credibility and account.

¶ 79    Moreover, Carrasco's position—that testimony from a section 115-21 hearing is inadmissible because the hearing serves a different purpose from trial—would effectively create a categorical bar. Illinois law rejects such a *per se* approach. See *People v. Rice*, 166 Ill. 2d 35, 39 (1995) ("determining whether ample opportunity to cross-examine at the prior hearing exists does not lend itself to a *per se* determination, but must be decided on the circumstances of each case"); *People v. Wright*, 2026 IL App (1st) 240238, ¶ 38 (rejecting an argument that preliminary-hearing testimony was inadmissible merely because a preliminary hearing has a different focus than trial); *People v. Tennant*, 65 Ill. 2d 401, 410-11 (1976) (discounting the argument that "the differences between the purposes of a preliminary hearing and those of a trial *** preclude admitting testimony given at a preliminary hearing" and affirming admission of preliminary hearing testimony). The inquiry instead turns on whether, under the particular circumstances, counsel had a similar motive and opportunity to test the witness. For the reasons stated above, Carrasco has not shown that this factor establishes clear or obvious error.

¶ 80    Carrasco next contends that counsel lacked material impeachment information at the time of the reliability hearing. He argues that Fisher's subsequent suicide revealed an underlying mental instability that counsel could not have explored during the earlier examination. According to

25

Carrasco, that information could have been used to challenge Fisher's ability to perceive, remember, or truthfully recount the alleged conversations, or to suggest that guilt over false testimony explained his suicide. Carrasco principally relies on *Torres*, which recognized that information unavailable to counsel during an earlier proceeding may affect whether the prior opportunity for cross-examination was adequate. See *Torres*, 2012 IL 111302, ¶¶ 62–64.

¶ 81     In *Torres*, the defendant was charged with first degree murder after a shooting inside a bar. *Id*. ¶ 4. At the preliminary hearing, witness testified that he saw the defendant and the victim speaking in the bar shortly before hearing a gunshot and then seeing the victim on the floor. *Id*. ¶¶ 7-8. The witness was deported to Mexico before trial, and the State later sought to admit his preliminary-hearing testimony. *Id*. ¶¶ 13, 16. The supreme court held that the testimony was improperly admitted because defense counsel lacked information later disclosed in discovery that would have materially affected the witness's credibility. *Id*. ¶¶ 62-66. Specifically, the witness had made inconsistent statements to police, may have had "a formidable incentive *** to curry favor with the State" because of his immigration status and deportation proceedings, and was the only witness placing the defendant in the bar at the time of the shooting. *Id*. ¶ 63. The court also observed that the trial judge's comments and rulings suggested counsel would have pursued additional cross-examination "had he felt free to do so." *Id*. ¶ 64.

¶ 82     The circumstances here are materially different. Unlike *Torres*, Carrasco does not identify any particular piece of impeachment information (*e.g.*, prior inconsistent statement, undisclosed benefit, undisclosed criminal history, or other concrete fact) that existed at the time of the reliability hearing and that counsel did not have. Carrasco's argument rests instead on a later-arising event: Fisher's suicide. For that event to show that counsel lacked material impeachment information, there must be some basis to conclude that Fisher suffered from a mental condition at

the time of the reliability hearing that bore on his ability to perceive, recall, or truthfully recount the alleged conversations. *Torres*, 2012 IL 111302, ¶ 58. Nothing in the record establishes such a condition, and no psychiatric, medical, or other evidence connects any condition to Fisher's testimonial capacity. See *People v. Williams*, 147 Ill. 2d 173, 237 (1991) (mental-health evidence is admissible for impeachment only where its relevance to credibility is established).

¶ 83 The mere fact that Fisher committed suicide, without more, does not establish such a condition or provide a basis for impeaching his prior testimony. Carrasco identifies no authority— and we are aware of none—holding otherwise. Rather, Illinois courts require both evidence of a mental-health condition and a showing that the condition affected the witness's ability to communicate observations accurately and truthfully. See *People v. Plummer*, 318 Ill. App. 3d 268, 276-78 (2000) (affirming limitation on cross-examination concerning witness's prior suicide attempt and hospitalization for depression where defendant failed to show how that history affected the witness's ability to communicate her observations accurately and truthfully); *People v. Helton*, 153 Ill. App. 3d 726, 734 (1987) (mere hospitalization for depression did not show impairment in witness's ability to communicate observations accurately and truthfully). Carrasco made neither showing here.

¶ 84 Moreover, Carrasco's contention that Fisher's suicide entitled him to another opportunity for cross-examination because it suggested guilt over his testimony is unsupported by the record. At the reliability hearing, Fisher described himself as a 51-year-old man with stage IV chronic obstructive pulmonary disease, cancer, and a history of two heart attacks, who had lost a child seven-and-a-half years earlier and had spent much of his adult life involved in the criminal justice system. Those circumstances do not establish why Fisher died, but they identify other possible sources of distress that, unlike Carrasco's theory, are grounded in the record. Nothing connects

Fisher's suicide to his testimony in this case. Carrasco's proposed inference therefore rests on conjecture rather than evidence and does not establish clear or obvious error. See *People v. Whitehead*, 116 Ill. 2d 425, 447-48 (1987) (plain error must be plainly apparent from the record).

¶ 85    Considering the *Torres* factors, we conclude that Carrasco had an adequate prior opportunity to cross-examine Fisher at the reliability hearing. Fisher's subsequent suicide did not reveal material impeachment information unavailable to counsel at that time. Accordingly, the admission of Fisher's testimony did not violate the confrontation clause. Absent an underlying error, Carrasco cannot obtain relief under either the plain-error doctrine or a theory of ineffective assistance of counsel. *Cox*, 2017 IL App (1st) 151536, ¶ 52.

¶ 86                    C. Detective Mukite's and Detective Johnson's Testimony

¶ 87    Carrasco next contends that the trial court permitted Detective Mukite and Detective Johnson to convey inadmissible hearsay under the guise of "course of investigation" testimony. First, he argues Detective Mukite improperly testified that the registered owner was Carrasco's "girlfriend or wife." Second, he argues Detective Johnson improperly summarized a traffic crash report indicating that, the day before the shooting, Carrasco was a passenger in a vehicle driven by the van's registered owner, Yesenia Conde.

¶ 88    We review a trial court's evidentiary rulings for abuse of discretion. *People v. Caffey*, 205 Ill. 2d 52, 89 (2001). Carrasco did not object at trial to Mukite's testimony or raise the issue in his posttrial motion. As to Johnson, counsel entered a standing objection to Johnson's testimony during the hearing on the motion *in limine*, however, counsel did not include that claim in the posttrial motion. Both claims are therefore forfeited. See *Sebby*, 2017 IL 119445, ¶ 48 (requiring a trial objection and inclusion of the issue in a posttrial motion). Carrasco nevertheless seeks

review under the plain-error doctrine or, alternatively, as claims of ineffective assistance of counsel.

"Under either theory, we must determine whether a clear error occurred. Under the plain error doctrine, 'the initial analytical step' is to determine whether a clear or obvious error occurred. "[Citation.]" Similarly, to succeed on a claim of ineffective assistance of counsel, defendant must show errors by counsel that were so 'serious' that counsel cannot be said to have been 'functioning' as counsel, which prejudiced defendant. "[citation]" Under either theory, defendant must show that the admission of this evidence constituted a clear error that counsel should have objected to." *Cox*, 2017 IL App (1st) 151536, ¶ 52.

¶ 89                                     *1. Detective Mukite*

¶ 90    Carrasco contends that Detective Mukite's testimony describing the van's registered owner as Carrasco's "girlfriend or wife" was inadmissible hearsay conveyed under the guise of course-of-investigation testimony. The State responds that defense counsel invited the testimony on cross-examination and, alternatively, that any error was not clear or obvious. The challenged testimony occurred during the following exchange between defense counsel and Detective Mukite:

"Q. Do you know who the registered owner of that vehicle was?

A. Yes.

Q. Who was it?

A. I forget the last name, but Jessica was the first name.

Q. It wasn't Ricco Carrasco, correct?

A. I believe it was his girlfriend or wife.

Q. But he wasn't on the title, correct?

29

A. No, he was not."

¶ 91    We are not persuaded that Carrasco clearly invited the relationship testimony. A defendant generally may not complain of errors which he injected into his own trial. *People v. Scott*, 148 Ill. 2d 479, 531-32 (1992). Here, defense counsel raised the van's ownership to establish that it was not registered to Carrasco, but did not ask about the owner's relationship to him. Mukite's statement that he believed the owner was Carrasco's "girlfriend or wife" exceeded the yes-or-no response counsel's leading question called for. The statement was therefore arguably nonresponsive and objectionable, rather than clearly invited.

¶ 92    That conclusion, however, does not establish plain error. Counsel did not object, move to strike Mukite's answer, or request an instruction directing the jury to disregard it. See *People v. Fritz*, 84 Ill. 2d 72, 80 (1981) (a nonresponsive answer should be stricken "when a proper motion to do so is made.") Because no such motion was made, the trial court committed no error by failing to strike the testimony *sua sponte*. See *People v. Cox*, 2017 IL App (1st) 151536, ¶ 87 (where "there was no error by the trial court, there can be no plain error.")

¶ 93    Carrasco's ineffective-assistance claim likewise fails for lack of prejudice. See *People v. Graham*, 206 Ill. 2d 465, 476 (2003) (a reviewing court may resolve an ineffective-assistance claim on the prejudice prong without deciding whether counsel's performance was deficient). Even assuming counsel should have objected or moved to strike, the challenged testimony was brief and limited. It did not identify Carrasco as the shooter, place him in the van at the time of the shooting, or relay an out-of-court accusation that he committed the offense. At most, it supplied a circumstantial link between Carrasco and the van's registered owner. Moreover, as discussed above the State presented substantial independent evidence identifying Carrasco as the shooter. It

follows that Carrasco has not shown a reasonable probability that the result of the trial would have been different had counsel objected and the answer been stricken.

¶ 94                                 *2. Detective Johnson*

¶ 95    Carrasco next challenges Detective Johnson's testimony that, after identifying Yesenia Conde as the minivan's registered owner, he located a traffic-crash report showing that Carrasco had been a passenger in a rental vehicle driven by Conde the day before the shooting. Johnson testified that the report concerned "a Ford EcoSport that was rented by Yesenia Conde" and that "Ricco Carrasco was a passenger in that vehicle."

¶ 96    The State moved *in limine* to permit Detective Johnson to explain how investigators developed Carrasco as a suspect. The prosecutor represented that, after identifying Conde as the minivan's registered owner, investigators searched for her name in a police database and located both a domestic-battery report and a traffic-crash report involving Carrasco. The State sought to elicit only that the crash report identified Carrasco as a passenger in a vehicle driven by Conde and that investigators then obtained his photograph.

¶ 97    Defense counsel responded that his "only concern" involved the domestic incident and questioned whether it had occurred. The court and the prosecutor assured counsel that Johnson would not mention the domestic report, criminal conduct, or a criminal database. Counsel then stated that he would "make a standing objection," and the court granted the motion "over Defense's objection," subject to those limitations.

¶ 98    Assuming counsel's standing objection encompassed the hearsay ground now asserted, he was not required to renew it at trial. Preservation nevertheless required inclusion of the claim in the posttrial motion. See *People v. Denson*, 2014 IL 116231, ¶ 11 (requiring an *in limine* or contemporaneous trial objection and inclusion in a posttrial motion). Because counsel did not do

31

so, the claim is forfeited and reviewable only for plain error or as a claim of ineffective assistance. See *id.* ¶ 18.

¶ 99    The State goes on to argue that invited error precludes plain-error review because counsel initially stated that his "only concern" involved evidence of a domestic incident and did not separately object to the traffic-crash report. We disagree. Invited error requires a defendant to procure, request, or affirmatively acquiesce in the challenged course of action. *Cox*, 2017 IL App (1st) 151536, ¶¶ 73-76. That is a more exacting standard than forfeiture, which may result merely from failing to make or preserve the proper objection. See *People v. Hale*, 2025 IL App (3d) 220510, ¶¶ 93-100. Although counsel did not articulate a specific hearsay objection to the traffic report testimony, he neither requested nor affirmatively agreed to the admission of the crash-report testimony. Instead, he entered a general standing objection, and the court granted the motion "over Defense's objection." The record here supports forfeiture, not invited error. We accordingly proceed to determine whether the challenged testimony was erroneously admitted. We must first establish that an error occurred. See *Cox*, 2017 IL App (1st) 151536, ¶ 52 (to obtain relief under either an ineffective assistance or plain error, a defendant must first establish that an error occurred).

¶ 100   Out-of-court statements offered for a purpose other than the truth of the matter asserted are not hearsay. Ill. R. Evid. 801(c). Thus, police officers "may recount the steps taken in the investigation of a crime, and may describe the events leading up to the defendant's arrest, where such testimony is necessary and important to fully explain the State's case to the trier of fact." *People v. Simms*, 143 Ill. 2d 154, 174 (1991). The testimony, however, must be limited to that purpose. An officer "may not testify to information beyond what was necessary to explain the officer's actions," and the State may not use the course-of-investigation rationale "to place into

evidence the *substance* of any out-of-court statement" obtained during the investigation. (Emphasis retained.) *People v. Ochoa*, 2017 IL App (1st) 140204, ¶ 41. Indeed, "[h]earsay testimony identifying the defendant as the one who committed the crime cannot be explained away as 'police procedure.' " *People v. Jura*, 352 Ill. App. 3d 1080, 1087-88 (2004) (holding that officers' testimony concerning a radio description exceeded what was necessary to explain why they proceeded to the scene); see also *People v. Williams*, 2023 IL App (1st) 192463, ¶¶ 95-96, 105-07 (holding that course-of-investigation evidence and the State's argument improperly conveyed the substance of nontestifying witnesses' statements implicating the defendant). Even when offered for a nonhearsay purpose, the testimony's relevance to that purpose must be weighed against its prejudicial effect. *People v. Warlick*, 302 Ill. App. 3d 595, 600-01 (1998).

¶ 101   Detective Johnson's testimony exceeded the permissible scope of course-of-investigation evidence. The State offered the testimony to explain how investigators progressed from Conde, the black minivan's registered owner, to Carrasco. That purpose could have been served by testimony that, after identifying Conde, a database search led investigators to Carrasco and that Johnson then obtained his photograph, determined that he matched the witnesses' description, and included him in a photo array. See *Ochoa*, 2017 IL App (1st) 140204, ¶ 41 (course-of-investigation testimony is limited to what is "necessary to explain [the officer's] actions").

¶ 102   Johnson instead conveyed the substance of the crash report. After testifying that the database revealed "an incident [involving] Yesenia Conde and a person by the name of Ricco Carrasco," he described "an additional report" concerning "a Ford EcoSport that was rented by Yesenia Conde" and stated that "Ricco Carrasco was a passenger in that vehicle." Those details were unnecessary to explain why Johnson obtained Carrasco's photograph. Their relevance instead depended on their truth: they established an association between Carrasco and Conde, the

registered owner of the black minivan used in the shooting, and thereby supported an inference that Carrasco had access to that vehicle. Thus, although presented as course-of-investigation evidence, the testimony conveyed the substance of an out-of-court assertion bearing directly on the disputed issue of identity. Its admission was error. See *id*. ¶¶ 40-41; *Jura*, 352 Ill. App. 3d at 1087-88.

¶ 103   Nonetheless, that error does not warrant reversal under the first prong of the plain-error doctrine. To obtain relief, Carrasco must show that the evidence was so closely balanced that the error alone threatened to tip the scales of justice against him. *Sebby*, 2017 IL 119445, ¶ 48. "In determining whether the evidence adduced at trial was close, a reviewing court must evaluate the totality of the evidence and conduct a qualitative, commonsense assessment of it within the context of the case." *Id*. ¶ 53. The inquiry involves an "assessment of the evidence on the elements of the charged offense or offenses, along with any evidence regarding the witnesses' credibility." *Id*.

¶ 104   Carrasco was tried for attempt first degree murder, aggravated discharge of a firearm, and aggravated battery with a firearm arising from the shooting of Manuel, O.S., and U.S. See 720 ILCS 5/8-4(a), 9-1(a)(1), 12-3.05(e)(1), 24-1.2(a)(2) (West 2022). The disputed issue common to those offenses was identity: whether Carrasco was the person who drove the black minivan and fired the shots. See *People v. Lewis*, 165 Ill. 2d 305, 356 (1995) (the State must prove the offender's identity beyond a reasonable doubt). Detective Johnson's challenged testimony bore on that issue by linking Carrasco to Conde, the minivan's registered owner.

¶ 105   The State's identification of Carrasco, however, did not solely rest with Detective Johnson's testimony. As discussed in Part A above, O.S. observed the minivan's driver at close range, described his distinctive tattoos, and identified Carrasco in a photographic array the following day and again at trial. Other evidence corroborated her identification: Manuel described

a similarly tattooed driver; police apprehended Carrasco four days later in the driver's seat of the same minivan; DNA recovered from the driver's compartment yielded a likelihood ratio strongly supporting Carrasco as one of three contributors; and Fisher recounted Carrasco's admissions concerning the shooting. Johnson's testimony therefore supplied only an additional circumstantial link between Carrasco and the minivan's owner.

¶ 106    Carrasco similarly argues that, once Johnson's testimony is removed, Manuel's selection of another person from a photographic array rendered the identity evidence closely balanced. The relevant inquiry, however "does not involve the sufficiency of close evidence but rather the closeness of sufficient evidence." *Sebby*, 2017 IL 119445, ¶ 60 (citing *People v. Piatkowski*, 225 Ill. 2d 551, 566 (2007) ("Whether the evidence is closely balanced is, of course, a separate question from whether the evidence is sufficient to sustain a conviction on review against a reasonable doubt challenge.")). Although Manuel selected another Hispanic man with a facial tattoo, he was driving during the shooting, the vehicles passed quickly, and his view was affected by snow and tinted windows. O.S., by contrast, observed the driver from the front passenger seat at close range and consistently identified Carrasco in a photographic array and at trial. Her identifications were further supported by Manuel's description of a heavily tattooed driver, U.S.'s account that the black minivan pulled alongside the Civic immediately before the gunfire, surveillance footage documenting the minivan's involvement, Carrasco's arrest four days later in the driver's seat of that minivan, Fisher's testimony recounting Carrasco's admissions, and Paulsen's DNA testimony.

¶ 107    This case therefore differs from *Sebby*, where our supreme court found the evidence closely balanced because both parties presented opposing, equally plausible accounts and no extrinsic evidence corroborated either version. See *Id.* ¶¶ 61-63 (noting that each side's witnesses gave largely consistent accounts, neither version was affirmatively discredited, and no physical or other

extrinsic evidence tipped the balance). Manuel's selection did not present an equally plausible competing account, particularly given the limitations on his opportunity to observe the driver. Thus, when viewed qualitatively and as a whole, the evidence was not closely balanced. Johnson's brief hearsay reference did not threaten to tip the scales against Carrasco, and first-prong plain-error relief is unavailable.

¶ 108 Carrasco likewise cannot establish second-prong plain error. That prong is reserved for errors so serious that they affected the fairness of the trial and challenged the integrity of the judicial process, regardless of the strength of the evidence. *Id*. ¶ 48. "These errors affect the framework within which the trial proceeds, rather than mere errors in the trial process itself." *People v. Moon*, 2022 IL 125959, ¶ 29. An error amenable to harmless-error analysis is not structural error (*People v. Logan*, 2024 IL 129054, ¶ 80) and the "[e]rroneous admission of evidence is subject to harmless error analysis" (*People v. Heineman*, 2023 IL 127854, ¶ 95). Accordingly, the improper admission of police hearsay does not, without more, constitute second-prong plain error. See *People v. Temple*, 2014 IL App (1st) 111653, ¶ 51 (holding that police hearsay exceeding the scope of course-of-investigation testimony was not structural error). Although Johnson's testimony was damaging, Carrasco identifies no circumstance beyond the admission of that discrete hearsay statement that transformed the error into one affecting the framework of the proceeding. Standing alone, it was an evidentiary error in the trial process and does not warrant second-prong relief.

¶ 109 Carrasco's related ineffective-assistance claim also fails. In light of the remaining evidence, he has not shown a reasonable probability that the result of the trial would have been different had counsel preserved the objection to Johnson's testimony. *Strickland*, 466 U.S. at 694; *People v. Albanese*, 104 Ill. 2d 504, 525 (1984).

¶ 110                     D. Prosecutorial Misconduct

¶ 111    We next address Carrasco's contention that several remarks during the State's closing and rebuttal arguments deprived him of a fair trial. Specifically, he argues that the prosecutors improperly exaggerated U.S.'s injuries, bolstered the State's witnesses, invoked accountability rhetoric that created an "us-versus-them" dynamic, suggested personal knowledge of his guilt, misstated the DNA evidence, and urged the jurors to "speak with one voice" and "send one message" by returning guilty verdicts.

¶ 112    The parties initially disagree concerning the applicable standard of review. Carrasco relies on *People v. Wheeler*, 226 Ill. 2d 92, 121 (2007), and argues that we review *de novo* whether the State's remarks constituted misconduct. The State relies on cases like *People v. Phagan*, 2019 IL App (1st) 153031, ¶¶ 48-50, and urges us to apply an abuse-of-discretion standard. In *Phagan*, this court examined the differing standards articulated in *Wheeler* and *People v. Blue*, 189 Ill. 2d 99 (2000), and concluded that claims of prosecutorial misconduct during closing argument are more appropriately reviewed under the abuse of discretion standard. *Phagan*, 2019 IL App (1st) 153031, ¶ 54. We follow *Phagan* and apply the abuse of discretion standard. Under this standard, "[t]he regulation of the substance and style of the closing argument is within the trial court's discretion, and the trial court's determination of the propriety of the remarks will not be disturbed absent a clear abuse of discretion." (Internal quotation marks omitted.) *Blue*, 189 Ill. 2d at 128.

¶ 113    Carrasco acknowledges, however, that he neither objected to the challenged remarks at trial nor raised them in his posttrial motion. He therefore failed to preserve the claims for review. *Enoch*, 122 Ill. 2d at 186. Carrasco asks that we reach the merits under plain error or, alternatively, as ineffective assistance of counsel. The threshold requirement for either avenue is the same: he must show a clear or obvious error. *Cox*, 2017 IL App (1st) 151536, ¶ 76.

"In general, prosecutors have wide latitude in the content of their closing arguments. "[citation]" The prosecutor may comment during closing argument on the evidence and on any fair and reasonable inference the evidence may yield, even if the suggested inference reflects negatively on the defendant. "[citation]" "Reviewing courts will consider the closing argument as a whole, rather than focusing on selected phrases or remarks. "[citation]" A reviewing court will find reversible error only if the defendant demonstrates that the improper remarks were so prejudicial that real justice was denied or that the verdict resulted from the error." *People v. Perry*, 224 Ill. 2d 312, 347 (2007).

¶ 114                    *1. The description of O.S.'s wound*

¶ 115 We first reject Carrasco's contention that the State improperly inflamed the jury by describing the gunshot wound suffered by eight-year-old U.S. Amongst other things, the prosecutor stated that the shots "[tore] into the backside of eight-year-old [U.S.], rip[ped] through his flesh, [and] [tore] out the bottom." He later referred to the bullet as having "tore through that boy's backside and ripped out the other end." The prosecutor also directed the jury to the photograph of the wound and stated, "[t]he bullet entered through the top, exited through the bottom, tore through this boy." A prosecutor may "comment unfavorably" where, as here, the description is anchored in the medical and photographic evidence admitted at trial. *People v. Nicholas*, 218 Ill. 2d 104, 121 (2005). Dr. Victoria Schlanser testified to the entry and exit tracts and the surgical intervention required, and photographs of the wound were in evidence. The prosecutor's language matched the evidence and was not gratuitous. On this record, Carrasco has not shown clear or obvious error on this ground.

¶ 116                    *2. "Send a message" and "us against them"*

¶ 117   Carrasco next contends that the prosecutor improperly aligned the jury with the State and urged it to convict him to send a message about gun violence. During closing argument, the prosecutor described the shooting as "this particular act of gun violence" that "demands accountability." The prosecutor then recounted how the police and the State's witnesses had done their part and concluded, "[I]f we've done our part I then ask you to do yours. Find him guilty." In rebuttal, the prosecutor asked the jurors to "speak as one" and "send one message to this defendant" that "[t]he rampant gun violence that he inflicted on the City of Chicago on the 4000 block of South Brighton and upon the Solis family" was "not okay."

¶ 118   A prosecutor may comment unfavorably on the harmful effects of the charged crime and urge the jury to administer the law without fear when the argument is based on the evidence. *Nicholas*, 218 Ill. 2d at 121-22. Limited references to deterrence are likewise permissible when the prosecutor makes "clear to the jury that its ability to effect general and specific deterrence is dependent *solely* upon its careful consideration of the specific facts and issues before it." (Emphasis retained.) *People v. Johnson*, 208 Ill. 2d 53, 79 (2003) (finding second prong plain error where the prosecutor's repeated appeals to send a message of support to law enforcement and to stand together as a community against the defendants, which merged the prosecution's position with the jury, society, and the community). A prosecutor may not, however, transform the trial into an extended denunciation of society's ills, urge the jury to act from generalized fear or outrage, or create an "us-versus-them" alignment among the prosecution, the jury, and the community against the defendant. *Id.* at 79-80; *People v. Deramus*, 2014 IL App (1st) 130995, ¶¶ 55, 58-59 (approving evidence-based comments on the harmful effects of the defendant's drug dealing but finding improper the statement that the conduct was "what he's doing to us," which created an "us-versus-them" alignment).

¶ 119   The challenged remarks approached, but did not clearly cross, that line, though it would behoove the prosecutor to refrain from such arguments in the future. The prosecutor's references to "rampant gun violence" and the "City of Chicago" invoked concerns extending beyond the elements of the charged offenses. Nevertheless, the prosecutor immediately tied those references to Carrasco's conduct at a specified location, the harm inflicted upon the Solis family, and the message the verdict would send "to this defendant." Unlike the arguments condemned in *Johnson*, the prosecutor did not tell the jurors that their own safety depended on a conviction, ask them to stand together as a community against Carrasco, or engage in an extended discussion of crime generally.

¶ 120   The prosecutor's request that the jurors "do [their] part" was also inartfully phrased because it rhetorically associated the jury with the police, the State's witnesses, and the prosecutors. But the remark was brief and appeared in an argument recounting the evidence and asking the jury to find Carrasco guilty because, according to the State, the evidence and law supported that result. Viewed in the context of the argument as a whole, the remarks did not clearly or obviously create the type of partisan alignment condemned in *Johnson* and *Deramus*. Accordingly, Carrasco has not established a clear or obvious error.

¶ 121                                  *3. "Courageous" Witness*

¶ 122   Carrasco next argues that the prosecutor improperly bolstered the State's witnesses and suggested that they faced danger by testifying. During closing argument, the prosecutor stated that O.S. "courageously got up on the stand" and that U.S. showed "a tremendous amount of courage getting up here and telling you about what happened to him." During rebuttal, the prosecutor also described Fisher as someone who received nothing for coming forward but nevertheless "put[ ] himself at risk making himself a witness."

¶ 123   A prosecutor may comment on a witness's credibility and respond to arguments attacking that credibility. *People v. Kirchner*, 194 Ill. 2d 502, 553 (2000). Whether a prosecutor may characterize a witness as courageous depends on the context. Compare *People v. Wallace*, 100 Ill. App. 3d 424, 433 (1981) (finding that references to the courage required to testify merely addressed the witnesses' credibility and did not suggest that the defendant would attack them), with *People v. Howard*, 147 Ill. 2d 103, 138-39 (1991) (finding improper the description of the State's witnesses as ordinary people who had the "courage" to testify, but concluding that the sustained objection cured any prejudice because the remark was brief and not repeated).

¶ 124   Viewed in context, the prosecutor's descriptions of O.S. and U.S. as courageous and Fisher as having "put himself at risk" were comments on the witnesses' credibility. Nothing in the prosecutor's argument suggested that Carrasco had threatened the witnesses, that they feared retaliation, or that Carrasco had a propensity to commit violence against them. The mere fact that the remarks portrayed the witnesses favorably and Carrasco unfavorably did not render them inflammatory or prejudicial. See *Wallace*, 100 Ill. App. 3d at 433. We therefore find no clear or obvious error on this ground.

¶ 125                    *4. Claimed Expression of Personal Knowledge*

¶ 126   Carrasco separately argues that the prosecutor asserted personal knowledge of his guilt by telling the jurors, "I can only hope now that [cocounsel] and I have done our part and that we've shown you this evidence and presented it to you in such a way that you've come to know what we know, and that's that this defendant is guilty." The prosecutor immediately added that the jury should find Carrasco guilty "not because I'm asking you to do so but because the law supports it and justice demands it."

¶ 127    A prosecutor may not "express his own opinion as to the defendant's guilt." *People v. Whitlow*, 89 Ill. 2d 322, 341 (1982). For a remark to constitute an improper assertion of personal opinion, however, the prosecutor must "explicitly state that he is asserting his personal views," and a reviewing court will not "infer that a prosecutor is injecting his personal opinion into an argument where the record does not unambiguously say so". (Internal quotation marks omitted.) *People v. Anderson*, 2011 IL App (1st) 071768, ¶ 61 (quoting *People v. Jackson*, 391 Ill. App. 3d 11, 43 (2009)).

¶ 128    The phrase "what we know" was better left unsaid, but the surrounding argument shows that the prosecutor was referring to the conclusion he believed followed from the evidence presented at trial. The prosecutor expressly linked the statement to how he and cocounsel had "shown" and "presented" the evidence and then instructed the jurors to convict because the law supported that result, not merely because the prosecutors requested it. Nothing in the argument suggested that the prosecutors possessed undisclosed information bearing on Carrasco's guilt. When read in context, this was simply a forceful summation of the State's view of the evidence rather than a clear or obvious assertion of personal knowledge. We therefore find no clear or obvious error.

¶ 129                    *5. Characterization of DNA Evidence*

¶ 130    Carrasco next contends that the prosecutor misstated the DNA evidence and committed the "prosecutor's fallacy." In closing argument, the prosecutor stated that O.S.'s identification had "science supporting [it] and corroborating it," that Carrasco "put himself there when his DNA was recovered from the driver's cabin of that car," and that "[s]cience puts him in the driver's seat of that car."

¶ 131  Paulsen testified that the DNA mixture from the van's driver's compartment was tested against two propositions: the mixture came from Carrasco and two unknown, unrelated contributors, or it came from three unknown, unrelated contributors. The results were 320 trillion times more likely under the first proposition and gave "very strong support" that Carrasco was a contributor.

¶ 132  The prosecutor's fallacy involves conflating a DNA statistic with the probability that the defendant was or was not the source of the DNA and, ultimately, with the probability of guilt or innocence. *Pike*, 2016 IL App (1st) 122626, ¶¶ 61-64 (citing *McDaniel v. Brown*, 558 U.S. 120, 128 (2010)). The prosecutor did not make that transposition here. He did not characterize the 320-trillion likelihood ratio as the numerical probability that Carrasco contributed the DNA or was guilty of the charged offenses.

¶ 133  The remark that science "puts" Carrasco in the driver's seat was broader than the DNA evidence alone: the test did not show when the DNA was deposited or who was driving during the shooting. But prosecutors may argue fair, reasonable inferences from the evidence. *People v. Perry*, 224 Ill. 2d 312, 347 (2007). Paulsen's testimony strongly supported the inference that Carrasco contributed to the mixture; the prosecutor could therefore argue that the DNA evidence corroborated O.S.'s identification. Viewed in context, the statement was forceful shorthand for that inference, not an improper conversion of the likelihood ratio into an absolute probability. This does not amount to clear or obvious error.

¶ 134  To the extent Carrasco's argument depends on his separate contention that Paulsen's testimony lacked an adequate foundation or violated his right to confrontation, we have addressed those claims in Part A above and need not revisit them here.

¶ 135                              *6. "Speak with one voice"*

¶ 136 Carrasco finally challenges the prosecutor's statement in rebuttal that, when the jurors were sworn, they "agreed at that point to speak with one voice," and the prosecutor's ensuing request that they "speak as one and send one message to this defendant." Carrasco contends that these remarks improperly suggested that the jurors were required to reach a unanimous verdict and surrender any conscientiously held disagreement.

¶ 137 Carrasco relies on *People v. Patten*, 105 Ill. App. 3d 892 (1982), and *People v. Gregory*, 184 Ill. App. 3d 676 (1989) for the proposition that the prosecutor's remarks improperly coerced unanimity. Those cases are inapposite. Both concerned supplemental communications by the trial court to a divided or deadlocked jury and the resulting danger of a "heed-the-majority" instruction, which encourages minority jurors to reconsider their positions merely because they are outnumbered. *Gregory*, 184 Ill. App. 3d at 681 (finding that the trial court's handling of a divided verdict improperly pressured the jury to reach unanimity and reversing and remanding for a new trial); *Patten*, 105 Ill. App. 3d at 894 (finding a supplemental instruction to a deadlocked jury improperly coercive). Neither case addresses a prosecutor's remark in closing argument that the jury's verdict must be unanimous, which is simply an accurate statement of law. See Illinois Pattern Jury Instruction, Criminal, No. 26.01 (4th ed. 2000) (unanimity). The jury here received the pattern unanimity instruction and was reminded that closing arguments are not evidence. We presume the jury followed those instructions. *People v. Illgen*, 145 Ill. 2d 353, 376 (1991). Accordingly, Carrasco has not established clear or obvious error based on this remark or any of the other prosecutorial comments addressed within this section above.

¶ 138                                    III. CONCLUSION

¶ 139   For the foregoing reasons, Carrasco has not established plain error or ineffective assistance of counsel as to any of his claims and is therefore not entitled to a new trial. Accordingly, we affirm the judgment of the circuit court.

¶ 140   Affirmed.